UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
TREZ CAPITAL (FLORIDA) CORPORATION,    :
                                       :
                          Plaintiff,   :        20cv9622 (DLC)
                                       :
              -v-                      :        OPINION AND ORDER
                                       :
NOROTON HEIGHTS & COMPANY, LLC,        :
                                       :
                          Defendant.   :
                                       :
-------------------------------------- X
-------------------------------------- X
                                       :
NOROTON HEIGHTS & COMPANY, LLC,        :
                                       :
                          Counterclaim :
                          Plaintiff,   :
              -v-                      :
                                       :
TREZ CAPITAL (FLORIDA) CORPORATION,    :
                                       :
                          Counterclaim :
                          Defendant.   :
                                       :
-------------------------------------- X

APPEARANCES:

For plaintiff and counterclaim defendant Trez Capital (Florida)
Corporation:
Stephen Bruce Meister
Remy Joanna Stocks
Meister Seelig & Fein LLP
125 Park Avenue, 7th fl.
New York, NY 10017

For defendant and counterclaim plaintiff Noroton Heights &
Company, LLC:
Leonard Matthew Braman
David M. Cohen
Laura Indellicati
Wofsey, Rosen, Kweskin & Kuriansky, LLP
600 Summer Street

Stamford, CT 06901

Dahn A. Levine
Mercedes Colwin
Ryan James Sestack
Gordon Rees Scully Mansukhani, LLP
1 Battery Park Plaza, 28th Floor
New York, NY 10004

DENISE COTE, District Judge:

The case arises out of a dispute about the borrower's obligations under a construction loan agreement entered into on November 15, 2019 (the "Loan Agreement"). Trez Capital (Florida) Corporation ("Trez" or "Lender") agreed to provide funding to Noroton Heights & Company, LLC ("Noroton" or "Borrower") for the redevelopment of a shopping center in Connecticut. Trez provided initial funds when the loan closed but was not obligated to continue funding the construction project unless several conditions precedent (the "Future Funding Requirements") were satisfied by a specified deadline.

On the eve of that deadline, Noroton disclosed to Trez that its original development may not be feasible and that it might pursue a dramatically different project. In the wake of this eleventh-hour update, the deadline to satisfy the Future Funding Requirements came and went with, from Trez's view, at least six unsatisfied conditions. Accordingly, Trez declined to provide further funding to Noroton.

Trez now seeks a declaration that it did not breach the Loan Agreement.  Noroton has counterclaimed.  This Opinion contains the Court's findings of fact and conclusions of law following a bench trial held between October 31 and November 1, 2022.  For the following reasons, judgment is granted to Trez on all of its claims and Noroton's counterclaims.

## Procedural History

Trez filed this action in New York state court on November 7, 2020.  Noroton removed the case to federal court on November 16.

On March 10, 2021, Trez moved to amend its complaint to add two defendants -- James C. Palmer and Gregory J. Palmer, two of the principal shareholders of Noroton Heights Shopping Center, Inc., the sole member of Noroton Heights & Company, LLC[1] -- as well as a third cause of action for attorney's fees and costs against these proposed defendants.  On August 23, 2021, the motion was denied.  Trez Cap. (Fla.) Corp. v. Noroton Heights & Co., LLC, No. 20CV9622 (AJN), 2021 WL 3727352, at *4 (S.D.N.Y. Aug. 23, 2021).

---

[1] For purposes of simplicity, Noroton Heights Shopping Center, Inc. and Noroton Heights & Company, LLC are both referred to in this Opinion as Noroton.

On April 10, 2022, the case was reassigned to this Court. On April 29, Noroton's motion to dismiss Trez's cause of action for attorney's fees was granted.  Noroton's motion to enforce a demand for a jury trial was denied on July 5.  Trez Cap. (Fla.) Corp. v. Noroton Heights & Co., LLC, No. 20CV9622 (DLC), 2022 WL 2437905, at *5 (S.D.N.Y. July 5, 2022).  Also on July 5, the Court placed the case on the October 2022 trial ready calendar.

On August 12 and 13, Trez filed motions in limine to exclude the testimony of Noroton's two expert witnesses -- Robert E. Unell and R. Bruce Gamble.  On September 24, Trez filed a third motion in limine to preclude Noroton from relying on certain documents dated after July 2, 2020.  On October 5, Trez filed a fourth motion in limine to preclude Noroton from relying on a new damages theory.

The motion to exclude Unell's testimony was denied on September 27.  On September 29, the motion to exclude Gamble's testimony was granted.  Trez Cap. (Fla.) Corp. v. Noroton Heights & Co., LLC, No. 20CV9622, 2022 WL 4547412 (DLC), at *6 (S.D.N.Y. Sept. 29, 2022).  The Court provided the parties with initial guidance on the remaining two motions in limine during a

final pretrial conference held on October 20 but reserved final decision on the motions.[2]

The parties submitted their joint pretrial order on September 23.  Noroton timely filed its proposed findings of fact and conclusions of law on September 23.  Trez belatedly did so on September 26.  Pursuant to this Court's Individual Practices in Civil Cases regarding non-jury trials and without objection by the parties, the parties offered the direct testimony of their witnesses at trial by affidavit.  Noroton provided affidavits constituting the direct testimony of its witnesses and the exhibits constituting its evidence in chief on September 27; Trez did so on September 28.

A bench trial commenced on October 31 and concluded on November 1.  Trez presented direct testimony through affidavit from two fact witnesses, Brett Forman, the Managing Director of Trez, and Hellois Scheeres, Trez's Director of Asset Management.  Noroton presented direct testimony from six fact witnesses: B. Cory Attra, a principal at Kevcor, Inc. and Noroton's project manager; Michael J. Hinton, Esq., a partner at Cummings & Lockwood, LLC and Noroton's transactional counsel; Robert F.

---

[2] These two motions in limine are now denied as moot.  At the trial, the Court excluded certain documents objected to by plaintiff that were dated after July 2, 2020, and, as explained below, Noroton is not entitled to damages based even on its revised theory.

Maslan, Jr., Esq., a principal at Maslan Associates P.C. and
Noroton's land use counsel; Gregory Palmer, the President of
Noroton; James Palmer, Noroton's Secretary and Treasurer; and
Thomas J. Walsh III, the Executive Vice President of Ashforth
Properties Construction, Inc. ("AP"), Noroton's general
contractor.  Noroton also presented the expert testimony of
Robert E. Unell, the Managing Director of Ankura Consulting
Group, LLC.  Noroton cross-examined both of Trez's witnesses;
Trez cross-examined all of Noroton's witnesses but Hinton and
Maslan.  Noroton also offered the deposition testimony of one
other witness, Russell Holland, Trez's former Managing Director
and the loan originator for the Noroton loan.  The Court's
findings of fact are largely contained in the section that
follows, but appear as well within the conclusions of law.

## **Findings of Fact**

Noroton owns multiple parcels of real property sitting
across from a Metro-North railroad station in the Noroton
Heights neighborhood of Darien, Connecticut (the "Property").
The Property housed a shopping center originally built in the
1950s that by the early 2010s was in decline.

To rejuvenate the area and capitalize on the convenient
location next to the railroad station, beginning around 2013,
Noroton started plans to develop the Property into a mixed-use

project.  Noroton's plan was to develop the shopping center into a two-building, three-story complex consisting of 59 residential units, with retail space on the buildings' ground floors (the "Project").

A.   The Loan Agreement

To construct the Project, Noroton required funding.  After meeting with several potential funders, Noroton entered into the Loan Agreement with Trez, a real estate investment firm.  The Loan Agreement is a thoroughly negotiated 76-page document with seven attached exhibits.  Under the Loan Agreement, Trez promised to loan Noroton up to $45,421,114[3] to construct the Project.  Trez was required to disburse an "Initial Funding Amount" of $5.9 million upon closing of the loan.  But the Loan Agreement also provided that "[n]otwithstanding anything contained herein to the contrary . . . Lender shall not be obligated to make any Advance, other than the Initial Funding Amount, unless Borrower shall have satisfied" thirteen conditions precedent (the "Future Funding Requirements") by February 13, 2020 (the "FFR Deadline").  That is, Trez was not required to make any disbursements after the Initial Funding

_____

[3] The precise amount of the loan depended on whether Noroton paid an additional equity payment to Trez to be held in an escrow account for the Project.

Amount unless Noroton timely satisfied the thirteen Future Funding Requirements.

Six of the thirteen are central to this dispute.  They are:

(b) Lender shall have received and approved the Construction Contract and Borrower and the Construction Manager shall have determined a guaranteed maximum price for the construction of the Project acceptable to Lender.

(c) Borrower shall have obtained all building and other permits from all applicable Governmental Authorities permitting demolition of the existing Improvements (except for the existing Improvements located on the Ground Lease premises) and construction of the entire Project in accordance with the Plans and Specifications.

(d) Lender shall have received and approved the final Project Budget itemizing the Project Costs, including Hard Costs and Soft Costs, certified to be true, correct and complete to the best knowledge and belief of Borrower.

(e) Without limitations to clause (d) above, if Lender determines that the Loan funds allocated for Hard Costs or Soft Costs in any final Project Budget that has been approved by Lender are inadequate to pay for any such costs (on either an aggregate or line item by line item basis), then Borrower shall have paid to Lender a Balancing Payment in the amount of the shortfall. . . .

(g) Lender shall have received and approved the final Plans and Specifications. . . .

[and] (k) Lender shall have received and approved will-serve letters from each subcontractor performing site, concrete, structural, steel, framing, mechanical, electrical or plumbing work at the Project.

(Emphases added.)  The Loan Agreement provides that "[a]ll matters set forth [in the Future Funding Requirements] that are subject to Lender's approval shall be subject to Lender's approval in its sole and absolute discretion."

The date on which Noroton could claim entitlement to its first draw upon the loan, after the initial disbursement, depended on Noroton satisfying the Future Funding Requirements. Thus, the "Future Funding Date" is defined in the Loan Agreement as "the date that Borrower is entitled to the First Draw[4] <u>after providing evidence acceptable to Lender</u> that Borrower has satisfied the Future Funding Requirements . . . , which Future Funding Date shall occur no later than ninety (90) days following the Closing Date."  (Emphasis added.)  The ninetieth day was February 13, 2020.

Certain other provisions of the Loan Agreement are also relevant here.  The Loan Agreement states that

> [a]ll rights, powers and remedies granted Lender [in the Loan Agreement], or otherwise available to Lender, are for the <u>sole benefit and protection of Lender</u>, and Lender may exercise any such right, power or remedy at its option and in its sole and absolute discretion without any obligation to do so.

---

[4] The Loan Ageement defines "First Draw" as "the first Advance of the Loan (other than the Initial Funding Amount), upon Borrower's satisfaction of the Future Funding Requirements."

(Emphasis added.)  According to the Loan Agreement, "[t]ime is
expressly made of the essence."  The Loan Agreement provides
that it, along with certain ancillary documents, "embody the
entire agreement of the parties" and that any subsequent
modifications of the agreement cannot be valid "unless the same
shall be in writing signed by all parties."  And, the Loan
Agreement indicates that Noroton entered the agreement "free[ly]
and voluntar[il]y" and that the execution and delivery of the
Loan Agreement "ha[d] not been induced by, nor done in reliance
upon, any representations, promises, warranties, understanding
or agreements made by" Trez.  Finally, the Loan Agreement
selects New York law as the law which will govern its terms.

     B.   The Hold Out Tenants

From the beginning, Noroton faced a problem with its
development plans -- holdout tenants.  The planned renovation
required the shopping center's existing tenants to move out, but
three of those tenants -- Glen Liquors, Inc. ("Glen Liquors"),
Embody Fitness Gourmet, LLC ("Embody Fitness"), and Phil's
Grill, LLC (doing business as Jimmy's Southside Tavern)
("Jimmy's") -- refused to do so.  Glen Liquors and Embody
Fitness were holdover tenants, and Noroton expected that they
would be successfully evicted.  Jimmy's, however, posed a
significant problem.

Unlike Glen Liquors and Embody Fitness, Jimmy's had a lease that extended to September 30, 2020, with options to renew for 5-year periods, or until 2030.  Because Noroton had anticipated that it might renovate the shopping center, the lease provided that Noroton could, upon proper notice, require Jimmy's to move to substitute premises.  Jimmy's, however, contended that Noroton never provided it with the required notice under this provision.  Additionally, the relocation provision in Jimmy's lease arguably allowed Jimmy's to operate in its current location up to the time when the substitute premises were available.  Thus, evicting Jimmy's prior to starting construction on the Project was not guaranteed.  This created a problem for Noroton because Jimmy's occupied a freestanding building in the middle of the development site for the Project.

Aware of the possibility that Noroton might be unable to evict Jimmy's quickly, Noroton worked with its general contractor, AP, to develop a "Plan B."  While the original "Plan A" involved constructing the Project in a single phase, Plan B called for a multi-phase construction.  Once there was a suitable new location in one of the newly constructed buildings, Jimmy's would be moved and construction of the remainder of the Project would continue.  When the parties were developing this Plan B in August and September 2019, they determined that the

multi-phase approach required "an 8 month extension" to the construction schedule and "result[ed] in a budget increase of $1,200,000."  This naturally affected the amount of money Noroton may have needed to borrow from Trez.  Accordingly, when Noroton and Trez entered into the Loan Agreement on November 15, the Loan Agreement was structured to accommodate either Plan A or Plan B and to allow Noroton to make a final election between the two options later.

Specifically, the Loan Agreement required Noroton to "pursue the total eviction" of Jimmy's.  In case it was unsuccessful, however, the eviction of Jimmy's was not a requirement for Noroton to receive funding.[5]  Instead, the Loan Agreement provided that if Jimmy's was not successfully evicted by April 13, 2020 (the "Eviction Deadline"), Noroton would use Plan B and would have access to a total loan amount of $45,421,114 to cover the additional costs required to build the Project in phases.  To receive this full amount, however, Noroton would need to provide Trez with an additional equity payment estimated at $700,000 (the "Additional Equity Payment").

---

[5] By contrast, because the evictions of the other two holdout tenants were not expected to pose any problems, evicting Glen Liquors and Embody Fitness was included as one of the Future Funding Requirements.

If, instead, Jimmy's was successfully evicted by the Eviction Deadline, the total loan amount would automatically reduce to $43,380,298.  Even if Jimmy's was successfully evicted by April 13, 2020, however, Noroton still had the option to access the full amount of $45,421,114.  Thus, the Loan Agreement included a proviso stating that, even if Jimmy's was timely evicted, "Borrower may elect, by providing written notice to Lender on or before the Eviction Deadline," to borrow the additional funds of the loan, "in which case the Borrower shall contribute" the Additional Equity Payment to Trez.  This election allowed Noroton to develop the Project using either Plan A or the lengthier and pricier Plan B and thus afforded flexibility to Noroton.  Importantly, although the Loan Agreement allowed Noroton to choose between Plan A and Plan B and to select the precise amount of funding, Noroton planned from the beginning to pay the Additional Equity Payment to unlock the full $45,421,114 of the loan, regardless of what happened with Jimmy's.  Accordingly, it worked to raise the additional $700,000 equity contribution needed to access the full loan funds.

With this setup in place, the parties moved forward with the Project.  After the loan closed on November 15, 2019, Trez

disbursed the Initial Funding Amount, and Noroton turned its attention to starting construction on the Project.

C.   The Future Funding Requirements

Trez was not required to fund any further amounts after the Initial Funding Amount unless Noroton satisfied the Future Funding Requirements by February 13, 2020.  As detailed above, these requirements included as relevant here: building permits for the Project, Trez's approval of will-serve letters from major subcontractors, Trez's approval of the final Project budget, Trez's approval of the Project's final plans and specifications, Trez's approval of the Construction Contract with a guaranteed maximum price for the Project, and Noroton's payment of any balancing payment required to rectify a budget shortfall.

1.   Early Submissions to Trez

For certain of the Future Funding Requirements at issue, documents relevant to the conditions had already been exchanged between Noroton and Trez by the time the Loan Agreement was executed.  These documents were only preliminary documents, however, which the parties anticipated would be finalized over the coming weeks.  For example, the Loan Agreement attached a budget for the Project but indicated that this budget was only a "preliminary" budget that was "subject to review and approval by

14

Lender and Lender's Construction Consultant(s)."  The Loan
Agreement also stated that

> Borrower acknowledges that (x) review and approval by
> Lender of the actual Project Budget is a "Future
> Funding Requirement" hereunder and (y) if Lender
> determines at any time that the Loan funds allocated
> to Project Costs are inadequate to complete the
> Project as provided herein, then Lender shall require
> Borrower to prove a Balancing Payment of equity in the
> Project in the amount of the shortfall.

Thus, despite receipt of a preliminary budget, the Future
Funding Requirements required Trez to approve the final budget.

Similarly, before entering the Loan Agreement, Trez had
received plans and specifications for the Project and had
initially approved those plans and specifications at least for
the purposes of underwriting the Project.  But the Loan
Agreement still made clear that Trez's receipt and approval of
the "final Plans and Specifications" was a condition for further
funding.  (Emphasis added.)

And likewise, before entering the Loan Agreement, Noroton
sent Trez a letter prepared by Noroton's land-use counsel, Bob
Maslan, describing the status of approvals and permits for the
Project (the "Maslan Letter").  The Maslan Letter noted that
Noroton had received several approvals for construction of the
Project from various state and local agencies, including for
example, zoning approval and sewer commission approval.  The
Maslan Letter also stated, however, that in addition to those

15

approvals already obtained, "the project will require several [further] approvals by various agencies" including demolition permits, zoning and building permits, sewer installation permits, and Health Department approvals.  Because of this, the Loan Agreement still required Noroton to "obtain[] all building and other permits from all applicable Governmental Authorities" prior to the FFR Deadline.  Accordingly, although certain preliminary documents relevant to the Future Funding Requirements were provided to Trez prior to entering the Loan Agreement, satisfaction of the Future Funding Requirements depended on subsequent events.

       2.   Later Submissions and Review by Trez's Consultant

After execution of the Loan Agreement, the parties continued working to ensure that the Future Funding Requirements were satisfied.  On December 3, 2019, Cory Attra, Noroton's project manager, sent to Russ Holland, the loan originator at Trez, the "Final Version of the [Construction] Contract."  This version was generally complete except that it was missing an amendment outlining the details supporting AP's guaranteed maximum price, or "GMP," for the Project (the "GMP Amendment").  AP and Noroton had previously established that the GMP would be $33.6 million, and Holland had approved this number.  Trez had also participated in the negotiation of the Construction

Contract, and before December 3, Holland had approved the form of the contract.  Because the GMP Amendment outlining the details supporting the GMP calculation had not been finalized, however, Trez had not yet approved the GMP Amendment.

After receiving the finalized Construction Contract, Holland forwarded it to a consultant, CBRE, Inc. ("CBRE"), that Trez hired to help review the Project and Noroton's satisfaction of the Future Funding Requirements.[6]  On December 16, Holland contacted CBRE to see if there was "[a]ny update for us on the ETA of the plan and cost review for Noroton."  In response, CBRE notified Holland that it was missing certain documents critical for the CBRE review, including: (1) up-to-date construction drawings and specifications, (2) a construction schedule, and (3) the GMP Amendment.  Less than an hour after receiving this communication from CBRE, Holland emailed Attra asking him to send the relevant documents.  Holland told Attra that CBRE "need[ed] th[em] to complete [its] review and [Trez] need[ed] [CBRE's] review ahead of any additional funding on the loan."

Noroton did not provide these documents in December.  Thus, Holland followed up with Attra on January 2.  On January 3, Attra sent Holland and CBRE an unexecuted version of the GMP

---

[6] The Loan Agreement provided that "[i]n connection with any matter submitted for Lender's approval Lender may consult with [a] Construction Consultant."  That consultant was CBRE.

Amendment and contacted the architect to have him send the requested drawings.  Notably, the GMP Amendment included a provision stating that the failure to vacate "Jimmy's Southside prior to March 1, 2020 shall result in an extension of time or an increase to the GMP, or both."  Holland asked Attra if the Construction Contract (and GMP Amendment) would be executed by Noroton and AP prior to "resolving the eviction of Jimmy's Southside," and Attra responded that he expected the agreement to be executed in the coming days.  After this exchange, Holland did not approve the GMP Amendment, but he told CBRE that the Construction Contract and budget were finalized for the purposes of review and instructed CBRE to complete its review of the Project once it received the drawings from the architect.  CBRE received those drawings on January 8.  It also received an executed version of the Construction Contract on January 22. Trez received an executed GMP Amendment by no later than January 14, but it does not appear that CBRE received the document.

On January 17, CBRE received Noroton's updated budget for the Project.  This budget differed from the preliminary budget attached to the Loan Agreement.  The preliminary budget stated that the total amount of sources and uses of funds was $67,197,165.  The revised budget, however, indicated that the total amount was $67,897,165.  That is, Noroton submitted a

budget indicating that the total amount of sources of funds and uses of funds was $700,000 higher than originally planned.  In late January, Noroton submitted its first payment requisition, which was based on the revised budget, requesting further funding on the loan.

On January 31, CBRE produced its final report reviewing the Project (the "CBRE Report") to Trez.  The CBRE Report contained several relevant findings.  It noted, for example, that CBRE had received most of the necessary documentation for its review, but that certain documents, including the fully executed GMP Amendment, remained outstanding.  The CBRE Report explained that the drawings and specifications it had reviewed were "well prepared, coordinated, sufficient to perform the work and have been continuously reviewed by [Noroton] and [AP] during their development."  It also noted that, although applications for permits had been made and CBRE had received some of those applications, no building permits had been issued for the Project as of January 31.  Indeed, the earliest date by which Noroton even applied for a building permit was January 13, 2020.

The CBRE Report also identified a new issue with the Project budget.  CBRE concluded that Noroton's proposed direct cost budget of $33,600,000 was "lower than anticipated" because the budget did not include a direct cost contingency for

19

Noroton.  To cover this contingency, CBRE recommended an increased direct cost budget of $34,600,000.

Thus, by January 31, Trez saw multiple red flags.  First, the revised budget that Noroton submitted to CBRE on January 17 was $700,000 higher than the preliminary budget.  Second, CBRE had concluded that the direct cost contingency in Noroton's budget was too low by $1 million.  And third, Noroton's budget called for the full amount of loan funds, but Noroton had not yet asked in writing to receive this full amount, nor had it paid the Additional Equity Payment of $700,000 required to unlock this amount.  In addition, Trez had recently learned that the hearing on Noroton's eviction proceeding against Jimmy's had been adjourned until February 14, 2020, the day after the FFR Deadline.

### 3.   The February 4 Telephone Call

With Noroton's request for funding in hand, the FFR Deadline approaching, and Trez's mounting concerns about the Project, Trez reached out to Noroton.  In a telephone call held on February 4, Trez expressed its concerns to Noroton and put it on notice that a number of issues needed to be resolved before Trez would provide further funding for the Project.

During the February 4 telephone conference, Hellois Scheeres, Trez's Director of Asset Management, and Peggy

Frazier, the asset manager for Noroton's loan, spoke with Attra.
Scheeres told Attra that the loan was "out of balance."  CBRE
recommended an additional $1 million contingency fund that
Noroton would have to fund.  She also indicated that Noroton's
revised budget relied on Trez providing the maximum loan amount
of roughly $45 million, but that would require Noroton to pay
the Additional Equity Payment of $700,000, which Noroton had not
yet funded.  And, she indicated that several Future Funding
Requirements, such as building permits, remained outstanding.
Beyond all of that, however, Scheeres told Attra that she was
concerned that Noroton's budget did not contemplate phasing
construction around Jimmy's in the event that Noroton did not
succeed in evicting Jimmy's.  Phasing construction around
Jimmy's would require a significant additional cost that was not
funded.

The call did not allay Trez's concerns.  Instead of
resolving the problems with the budget, Attra admitted that Plan
B for the Project -- in which construction would occur in two
phases -- was "underfunded."  He also disclosed for the first
time that Noroton was devising a new approach (the "Alternative
Development") in the event Noroton did not succeed in evicting
Jimmy's.  The Alternative Development represented an entirely
different project from the one funded through the Loan

Agreement.  This new development deleted a portion of Building 2 of the Project, reconfigured the apartments for a net loss of six apartments, reconfigured the parking for a net loss of 1,000 to 3,000 square feet of retail space, relocated an elevator, and deleted certain features such as a bridge and a clock tower.

The Alternative Development constituted a major change to the scope of work and would require amendment to the zoning and building permits, updated construction cost figures and schedules, and a new written proposal to be approved by Trez.[7] (Attra eventually provided Trez with new plans and budgetary details for the Alternative Development on February 19 and 20.) After the February 4 call and before the February 13 FFR Deadline, Trez did not indicate that the problems it had identified in the call had been resolved, and Noroton did not reach out to Trez in an effort to address them.

4.   Will-Serve Letters

Even apart from the budget shortfalls, the lack of building permits, and the possibility that Noroton would pursue the Alternative Development, there were other barriers to Noroton

---

[7] The parties dispute what was said in the February 4, 2020 telephone call and provide different interpretations of the emails that were exchanged on February 4 and 5 about the conversation.  The Trez witness to the conversation provided a more fulsome account of the conversation and her testimony is better corroborated by the written record.

securing further funding under the Loan Agreement.  Prominent among them was the absence of will-serve letters.[8]

The Loan Agreement required Trez to receive and approve will-serve letters from seven subcontractors.  On January 2, 2020, AP sent a draft of a template will-serve document to be executed by those subcontractors to Attra, Holland, and Trez's counsel.  On February 10, Trez's counsel approved the template.[9] The subcontractors for the Project eventually executed subcontracts with AP that included the required terms.  Noroton provided Trez with these executed subcontracts on March 13, 2020, one month after the FFR Deadline.  These subcontracts indicated that they were made effective as of various dates in January 2020.

     5.   The State of Affairs at the FFR Deadline

The FFR Deadline came and went.  To recap, as of that deadline, much remained up in the air.  Trez had a budget submitted by Noroton that differed from the preliminary budget and that had, from Trez's perspective, at least three major

---

[8] A will-serve letter is a written memorialization of a contractor or subcontractor's obligation to continue working on a project on behalf of a lender in the event the developer or general contractor defaults.

[9] On February 12, after Trez approved the template, Noroton's counsel asked Trez if there were any other impediments to further funding.  Trez did not respond directly to this email.

problems.  These problems had been communicated to Noroton but had not been resolved by the FFR Deadline.  Indeed, even from Noroton's perspective, the Project was underfunded.

Trez had the Construction Contract, the form of which it approved no later than December 2019.  It also had a GMP Amendment to the Construction Contract outlining the terms of AP's guaranteed maximum price.  Although Trez had previously approved, in principle, a guaranteed maximum price of $33.6 million, it had not given Noroton final approval of the GMP Amendment document and instead had only submitted it for CBRE's review.  And importantly, the GMP Amendment included a term that would allow AP to increase the guaranteed maximum price if Jimmy's was not evicted by March 1.  That is, the guaranteed maximum price, was not quite "guaranteed" since the eviction of Jimmy's was not yet settled.

Trez had a template will-serve document, that it approved on February 10 for use by the major subcontractors.  Trez did not, however, have any executed versions of this document from the subcontractors.  And, Noroton had not obtained a single building permit for the Project.

Beyond all of this, Noroton told Trez that it was actively considering a radically different project:  the Alternative Development.  The Alternative Development would require new

plans, a new budget, new zoning approvals, and a revised funding
agreement with Trez.

D.   Events After the FFR Deadline

After the FFR Deadline passed and no later than February
18, Trez communicated to Noroton that it was not going to
continue funding the loan.  On February 18, five days after the
FFR Deadline, Noroton received the first building permit.  That
same day, when Attra sent the permit to Holland, Holland emailed
Attra thanking him for sending the permit, but informing him
that the "bigger issue" holding up funding related to the
problems identified by CBRE with the Project budget.  Also on
that day, Attra spoke with Holland and Scheeres over the
telephone and discussed several of the outstanding Future
Funding Requirements including the Construction Contract and
GMP, the building permits, the final Project budget, the
$700,000 equity infusion, and the final plans and
specifications.

On February 21, Attra provided an update to Noroton saying
that Trez would be "sending us a letter to the effect that we
have not satisfied the conditions precedent and are not funded
for construction."  Attra advised that it would be imprudent to
start demolishing buildings until the problems with the Future
Funding Requirements were resolved.

For a few days, Trez and Noroton continued to work together
to try to resolve the problems and continue the Project.
Certain Trez employees attempted, for example, to reallocate
line items on the budget to resolve the $1 million contingency
shortfall.  Trez was initially hopeful this would succeed, so
Peggy Frazier emailed Attra explaining that "there is agreement
in principle that our budgets now tie together" and that the
team was "exploring a potential path forward to get approval for
funding."

Trez internally considered the possibility of extending the
deadline to satisfy the Future Funding Requirements until April
13, 2020, the Eviction Deadline for Jimmy's set forth in the
Loan Agreement.  Trez's Credit Committee initially approved a
deadline extension on March 3.  Ultimately, however, Trez opted
not to extend the FFR Deadline and not to continue funding the
loan.

Accordingly, on March 9, Trez's counsel emailed Noroton's
counsel to more formally explain that Trez was not willing to
make any additional advances.  Counsel noted that several Future
Funding Requirements were not satisfied by the FFR Deadline,
including the receipt and approval by Trez of the required

building and other permits and the will-serve letters for the

subcontractors.[10]   Trez's counsel also asserted that Noroton was

> well aware that Lender's construction consultant has
> concluded that the preliminary budget underestimates
> the costs to complete the Project, and that Borrower
> will be required to contribute additional up-front
> equity to cover budget shortfalls.  The cost review by
> Lender's consultant is also a Future Funding
> Requirement, and Lender is not obligated to make loan
> advances while a shortfall deficiency in the budget
> exists.

The March 9 email further noted that "[t]here are

additional factors that make the Lender unwilling to waive the

conditions precedent to additional loan advances" including

"[t]he fact that, contemporaneously with Borrower's initial

request for an additional loan advance, Borrower advised the

Lender that, due to complications associated with the eviction

of Jimmy's Southside, Borrower intended to build a project

different from the Project required under the Loan Agreement."

Counsel explained (as Scheeres had before) that this significant

change would require Trez's review and approval, "as well as

formal written amendments to the Loan Documents satisfactory to

Lender."  He also stated that although Borrower had recently

suggested that it was getting closer to a favorable settlement

---

[10] The email also identified a problem with another Future
Funding Requirement regarding a cost estimate and groundwater
sampling plan, but the parties agree that this condition is no
longer at issue.

with Jimmy's, "the situation with Jimmy's Southside remains fluid . . . and, of course, no settlement with Jimmy's Southside has yet been reached."  Finally, he noted that, because the Future Funding Requirements were not satisfied, pursuant to § 2.3.8 of the Loan Agreement, the floor interest rate of the loan increased.

Over the next several days, counsel for Noroton sent several responsive emails contesting Trez's assertion that Noroton failed to satisfy the Future Funding Requirements. These emails also included news that Noroton had received a favorable ruling in the Jimmy's eviction proceedings on March 11 and that Noroton was optimistic that it could quickly reach a settlement on the eviction.[11]  Several months after this email correspondence, Noroton secured a bridge loan, and on July 2, Noroton repaid in full the funds that it had borrowed from Trez, plus any outstanding interest, fees, and costs.

## Conclusions of Law

Because Noroton failed to satisfy several of the Future Funding Requirements by the FFR Deadline, Trez did not breach the Loan Agreement when it declined to provide further funding

---

[11] Jimmy's appealed this ruling, and on September 7, 2021, it was reversed in favor of Jimmy's.

for the Project and it is not liable to Noroton for damages. Accordingly, judgment is granted for Trez on its claims and on Noroton's breach of contract counterclaim.  Noroton's remaining counterclaims are either duplicative of its breach of contract claim or lack merit.  Accordingly, judgment is granted for Trez on Noroton's remaining counterclaims, as well.

I.    Declaratory Judgment and Breach of Contract

Noroton asserts that Trez breached the Loan Agreement when Trez refused to provide Noroton with additional funding. Noroton acknowledges that it had a contractual obligation to satisfy each of the Future Funding Requirements before the FFR Deadline and asserts that it did so.  It did not.  Because Noroton failed to satisfy all of the Future Funding Requirements prior to the FFR Deadline, Trez did not breach the Loan Agreement by declining to provide Noroton with any additional funds after the initial disbursement.

A.    Legal Standards

Under New York law,[12] a plaintiff bringing a breach of contract claim "must prove: (1) the existence of a contract, (2)

---

[12] Although the parties disagree on the choice of law for certain of Noroton's counterclaims, they agree that New York law governs the breach of contract issues.  The Loan Agreement provides that, except for certain provisions not at issue in this case, the agreement "shall be governed by, and construed in accordance with, the laws of the state of New York applicable to contracts made and performed in such state."

performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach." Moreno-Goody v. Kartagener, 7 F.4th 78, 85 (2d Cir. 2021) (citation omitted).  The burden of proof on a breach of contract claim is on the party asserting breach.  Id.  Likewise, "[t]he party seeking to enforce a contractual obligation generally bears the burden of proof with respect to a condition precedent." Rachmani Corp. v. 9 E 96th St. Apt. Corp., 629 N.Y.S.2d 382, 386 (1st Dep't 1995).  The burden of proof does not shift to the opposite party merely because an action is for declaratory judgment.  See Medtronic, Inc. v. Mirowski Fam. Ventures, LLC, 571 U.S. 191, 194, 198-201 (2014); Preferred Accident Ins. Co. of N.Y. v. Grasso, 186 F.2d 987, 990-91 (2d Cir. 1951).  Accordingly, the burden of proof to show that Trez breached the Loan Agreement (and to show that Noroton satisfied the Future Funding Requirements) is on Noroton for both Trez's declaratory judgment claim and Noroton's breach of contract counterclaim.

The law that governs the breach of contract claim is well settled.  Under New York law, a contract "that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc., 7 F.4th 50, 56 (2d Cir. 2021) (citation

omitted).  Under New York law, a contract is unambiguous if its
language has "a definite and precise meaning, unattended by
danger of misconception in the purport of the contract itself,
and concerning which there is no reasonable basis for a
difference of opinion."  Olin Corp. v. OneBeacon Am. Ins. Co.,
864 F.3d 130, 148 (2d Cir. 2017) (citation omitted).  "If the
terms of a contract are clear, courts must take care not to
alter or go beyond the express terms of the agreement, or to
impose obligations on the parties that are not mandated by the
unambiguous terms of the agreement itself."  Steiner v. Lewmar,
Inc., 816 F.3d 26, 32 (2d Cir. 2016) (citation omitted); Torres
v. Walker, 356 F.3d 238, 245 (2d Cir. 2004) (citation omitted)
(applying New York law).

To determine whether disputed contract language is
ambiguous, a court must ask whether it is "ambiguous when read
in the context of the entire agreement."  32BJ N. Pension Fund
v. Nutrition Mgmt. Servs. Co., 935 F.3d 93, 100 (2d Cir. 2019)
(citation omitted); Law Debenture Tr. Co. of N.Y. v. Maverick
Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010) (citation omitted)
(applying New York law).  "[W]here consideration of the contract
as a whole will remove the ambiguity created by a particular
clause, there is no ambiguity."  Law Debenture Tr. Co., 595 F.3d
at 467 (citation omitted).  In interpreting contracts, "words

should be given the meanings ordinarily ascribed to them and absurd results should be avoided." Mastrovincenzo v. City of New York, 435 F.3d 78, 104 (2d Cir. 2006) (citation omitted) (applying New York law).

"[A] condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc., 821 F.3d 297, 305 (2d Cir. 2016) (citation omitted) (applying New York law). Under New York law, "[e]xpress conditions must be literally performed; substantial performance will not suffice." In re Johns-Manville Corp., 759 F.3d 206, 214 (2d Cir. 2014) (citation omitted).

"Under New York law, implicit in every contract is a covenant of good faith and fair dealing . . . which encompasses any promises that a reasonable promisee would understand to be included." JN Contemp. Art LLC v. Phillips Auctioneers LLC, 29 F.4th 118, 128 (2d Cir. 2022) (citation omitted). This implied covenant

> includes a promise that neither party to a contract
> shall do anything that has the effect of destroying or
> injuring the right of the other party to receive the
> fruits of the contract, or to violate the party's
> presumed intentions or reasonable expectations.

Id. (citation omitted).  As a corollary to the implied covenant
of good faith and fair dealing, "a party to a contract cannot
rely on the failure of another to perform a condition precedent
where he has frustrated or prevented the occurrence of the
condition."  Utica Mut. Ins. Co. v. Clearwater Ins. Co., 906
F.3d 12, 23 (2d Cir. 2018) (citation omitted) (applying New York
law).  Nevertheless, "under New York law, the implied covenant
of good faith and fair dealing cannot be used to impose an
obligation that is inconsistent with express contractual terms."
In Touch Concepts, Inc. v. Cellco P'ship, 788 F.3d 98, 102 (2d
Cir. 2015).

Finally, under New York law, breach of the duty of good
faith and fair dealing "is merely a breach of the underlying
contract."  L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419,
434 n.17 (2d Cir. 2011) (citation omitted) (applying New York
law).  Thus, a claim for breach of the implied covenant of good
faith and fair dealing must be dismissed as redundant when both
claims are based on the same set of facts.  Id.

B.  Application

Noroton's breach of contract claim, and Trez's request for
a declaration that it did not breach the parties' contract, rest
on a determination of whether Noroton satisfied the Loan
Agreement's thirteen Future Funding Requirements.  The parties

33

do not argue that the Loan Agreement's recitation of these requirements or the provisions that relate to them are ambiguous.

The Loan Agreement requires the satisfaction of each of the Future Funding Requirements as a condition precedent to Trez's obligation to disburse amounts beyond the Initial Funding Amount.  Accordingly, if Noroton failed to satisfy any one of the Future Funding Requirements within 90 days of closing, which was February 13, 2020, Trez was not obligated to disburse any funds past the Initial Funding Amount.

Trez proved at trial that Noroton did not satisfy at least five of the Future Funding Requirements by the FFR Deadline.  As a corollary, Noroton failed to show that it did satisfy each of these five requirements by February 13, 2020.  Therefore, Trez was not obligated to provide additional funding to Noroton after the initial disbursement.

### 1.   Final Budget

Subsection (d) of the Future Funding Requirements reads: "Lender shall have received and approved the final Project Budget itemizing the Project Costs, including Hard Costs and Soft Costs, certified to be true, correct and complete to the best knowledge and belief of Borrower."  (Emphasis added.)  Trez did not approve the final Project budget by February 13, 2020.

34

Although there was an initial budget attached to the Loan Agreement that Trez approved for underwriting purposes, the receipt of further funding was conditioned on Trez approving the final Project budget.

In January, Noroton revised the Project budget to add $700,000 in sources and uses of funds. In addition, that January budget called for the full loan amount of roughly $45 million. In order to unlock that amount, Noroton needed to pay an Additional Equity Payment of roughly $700,000, but Noroton had not yet advised Trez that it would select this option or paid the $700,000 to receive the larger loan amount. Finally, when CBRE reviewed the Project budget, it noted that there was no direct cost contingency included in the budget and therefore recommended a budget increase of $1 million. So, before the FFR Deadline, Trez identified three problems with the budget that totaled a budget shortfall, or in the parties' terms an "imbalance," of roughly $2.4 million. Noroton's agent admitted in the conversation with Trez on February 4 and his responsive email on February 5 that the Project was underfunded. Most crucially for the Loan Agreement's Future Funding Requirements, Trez never indicated to Noroton that it approved Noroton's current budget. As a result, the Future Funding Requirement regarding the budget was not satisfied.

35

Noroton offers several arguments in an effort to minimize the impact of the unbalanced budget on Noroton's obligations. It points to a portion of the CBRE Report that suggested that the amount to cover the $1 million direct cost contingency "may be available within the indirect cost contingencies" and complains that Trez never shared the CBRE Report with it. Noroton also points out that, in the parties' informal discussions in the days following the FFR Deadline, the parties themselves discussed using the indirect cost contingencies in the budget to offset the absence of a $1 million direct cost contingency.

Noroton's arguments regarding the $1 million shortfall fail. Trez was entitled to approve or reject the final budget in its "sole and absolute discretion," and it did not approve it by February 13. In any event, Trez was under no obligation to share the CBRE Report with Noroton, but did promptly share with it the problems with Noroton's budget and other obligations that the CBRE Report identified. As for the informal discussions the occurred after the FFR Deadline, while the parties were able to "tie together" their budgets, those discussions did not result either in Noroton satisfying Trez's concerns over how Noroton would fund the Project's new bottom line or in Trez approving the budget. More to the point, the discussions certainly did

36

not result in Trez approving the final budget prior to the FFR Deadline.

Noroton also argues that the budget Future Funding Requirement was satisfied because CBRE approved payment requisitions on February 14.  But CBRE's approval of these requisitions occurred after the FFR Deadline had passed. Further, while CBRE approved the requisition, it had also advised Trez of budgetary problems.  In any event, the Loan Agreement required Trez to approve the budget.  As Trez advised Noroton, CBRE's review of the Project and Future Funding Requirements was simply a prerequisite to Trez's own review.

2.   Balancing Payment

Subsection (e) of the Future Funding Requirements reads:

> Without limitations to clause (d) above, if Lender determines that the Loan funds allocated for Hard Costs or Soft Costs in any final Project Budget that has been approved by Lender are inadequate to pay for any such costs (on either an aggregate or line item by line item basis), then <u>Borrower shall have paid to Lender a Balancing Payment in the amount of the shortfall</u>.

(Emphasis added.)  Noroton did not pay a balancing payment to cover the shortfalls identified by Trez.  It admitted on February 4 and 5 that the Project was underfunded.  Accordingly, Noroton did not satisfy this Future Funding Requirement.

In response, Noroton contends that the Loan Agreement gave Noroton until April 13 (the Eviction Deadline) to pay the

$700,000 Additional Equity Payment required to unlock the full
$45 million in loan funds.  Accepting that to be a fair reading
of the Loan Agreement, Noroton's reliance on that payment
deadline did not excuse its failure to make other balancing
payments by February 13.  The Additional Equity Payment was only
one of three budget discrepancies.  Noroton's revised budget
increased the cost of the Project from $67,197,165 to
$67,897,165, and Noroton admitted that increase of $700,000 was
unfunded.  Moreover, the $1 million budgetary discrepancy
identified by CBRE was unresolved by February 13.  Noroton was
aware of these amounts by at least February 4 but did not pay a
balancing payment in these amounts by the FFR Deadline.

        3.   Permits

Subsection (c) of the Future Funding Requirements reads:

> Borrower shall have obtained <u>all building and other
> permits from all applicable Governmental Authorities</u>
> permitting demolition of the existing Improvements
> (except for the existing Improvements located on the
> Ground Lease premises) and construction of the entire
> Project in accordance with the Plans and
> Specifications.

(Emphasis added.)  Noroton did not secure "all building and
other permits from all applicable" regulatory authorities by the
FFR Deadline.  Indeed, Noroton did not receive the first
building permit until February 18, several days after the FFR

Deadline.  Noroton had not applied for its first building permit until January 13.

Noroton argues, despite the contractual language requiring Noroton to secure "all building and other permits," that Noroton did not need to secure any such permits because it had provided Trez with the Maslan Letter, which explained the permitting process in Darien.  This is unpersuasive.  At the outset, the Maslan Letter was received on November 14, 2019, and the Loan Agreement was executed the following day.  If provision of the Maslan Letter were sufficient to satisfy the Future Funding Requirement regarding building permits, there would have been no reason to include the building permit Future Funding Requirement in the Loan Agreement.

Furthermore, the Maslan Letter merely explained that permitting in Darien occurs pursuant to a process, with zoning permits being granted prior to building permits and permits being issued sequentially during different phases of construction.  The fact that Trez was aware that the permitting process was sequential did not relieve Noroton of its obligation to secure building permits by the FFR Deadline.

Noroton also contends that the Loan Agreement requires only that Noroton provide all "applicable" permits by the FFR Deadline.  The word "applicable" refers to the regulatory bodies

rather than the permits.  That is, the provision requires that
Noroton obtain <u>all</u> the building permits from any regulatory body
that would have authority over the Project.  In any event, it is
Noroton's burden to show that it satisfied the Future Funding
Requirements.  There was at least one building permit that was
important to the Project as of February 13, 2020, and Noroton
provided that permit late.

        4.   Will-Serve Letters

Subsection (k) of the Future Funding Requirements reads:
"Lender shall have <u>received and approved will-serve letters from
each subcontractor</u> performing site, concrete, structural steel,
framing, mechanical, electrical or plumbing work at the
Project."  (Emphasis added.)  Noroton did not provide the
necessary seven will-serve letters from the Project
subcontractors by the FFR Deadline.

Noroton argues that, in lieu of individual letters from
each subcontractor, Trez agreed to accept a single will-serve
letter from AP coupled with flow-down provisions in AP's
subcontracts.  This argument fails.  Noroton's argument is based
on a February 10, 2020 email from Trez's counsel stating that
Trez approved a will-serve letter template.[13]  That email does

---

[13] The Loan Agreement requires that, to be valid, any
modifications to the agreement must "be in writing signed by all

not support Noroton's claim that Trez agreed to accept a single will-serve agreement from AP.

The template is addressed to Trez from a "subcontractor" -- not AP, the general contractor -- with a placeholder to fill in the subcontractor's name and title.  Thus, when Trez approved the template "for use by major subcontractors," Trez approved the <u>format</u> of the document to be executed by the subcontractors. It did not relieve Noroton of the obligation to provide Trez with executed will-serve documents from subcontractors.  Even assuming that Trez agreed to accept a single will-serve agreement from AP coupled with subcontracts containing flow-down will-serve provisions, Noroton did not provide Trez with subcontracts until one month after the FFR Deadline.

Noroton argues that Trez's delay in approving the template frustrated Noroton's ability to satisfy this requirement in a timely manner.  To be sure, Trez waited until three days before the FFR Deadline to approve the template.  On the other hand, there is no evidence that Noroton asked for any earlier decision or that Noroton needed one month after approval of the template to provide the subcontractor letters.

---

parties."  The email from Trez's counsel is obviously not a document signed by all parties to the Loan Agreement.

Were there no other problems with Noroton's satisfaction of the Future Funding Requirements, this would be a closer call. But, Noroton's failure to address this Future Funding Requirement with the requisite urgency is indicative of its larger failure to treat those requirements seriously.

            5.      Construction Contract and GMP Amendment

Subsection (b) of the Future Funding Requirements reads:

> Lender shall have received and approved the
> Construction Contract and Borrower and the
> Construction Manager shall have determined a
> <u>guaranteed maximum price for the construction</u> of the
> Project <u>acceptable to Lender</u>.

(Emphasis added.)

There is no evidence that Trez had accepted the GMP Amendment to the Construction Contract that Noroton provided CBRE and Trez on January 3. Although Trez had approved the form of the Construction Contract and had agreed, in principle, to a GMP of $33.6 million, it did not approve the GMP Amendment. The GMP Amendment provided that, if Jimmy's was not evicted by March 1, 2020, AP had the right to increase the GMP. Therefore, the GMP Amendment did not guarantee any specific maximum price to be paid to the general contractor for the Project. Accordingly, Noroton failed to satisfy this Future Funding Requirement.

Noroton argues that Holland had approved the GMP and the Construction Contract in the early stages of the Project. It is

true that Trez approved the Construction Contract.  It is also
true that a GMP of $33.6 million was accepted by Trez.  But the
problem for Noroton is that Trez did not offer its approval or
acceptance of the GMP Amendment, which included a material
change in that it did not guarantee the $33.6 million figure.

6.   Final Plans and Specifications

Subsection (g) of the Future Funding Requirements reads:
"Lender shall have received and approved the final Plans and
Specifications."  (Emphasis added.)  Noroton has shown that the
last Future Funding Requirement at issue here was timely
satisfied by Noroton.

Trez received preliminary plans for the Project before it
entered into the Loan Agreement and it approved those plans for
the purposes of underwriting the loan.  Additionally, nothing in
the CBRE Report raised any issues with the plans and instead
confirmed that they were adequate for construction of the
Project.  Further, there is no evidence that the plans for the
original Project changed materially in the period between the
closing of the Loan Agreement and the FFR Deadline.  Thus, Trez
approved the final plans and specifications for the Project.

Trez argues that it had not approved the final plans and
specifications because, during the February 4 call, Noroton
explained that it may pursue the Alternative Development.  But

43

the Alternative Development was not the Project covered by the
Loan Agreement.  In this lawsuit, the parties seek to enforce
the Loan Agreement, not a hypothetical new agreement that would
have been required had Noroton pursued the Alternative
Development.  Accordingly, Trez did not need to receive or
approve the plans and specifications for the Alternative
Development for Noroton to satisfy the Future Funding
Requirements set forth in the Loan Agreement.

    C.   Noroton's Two Additional Arguments

    Noroton's two remaining arguments lack merit.  First,
Noroton argues that Trez failed to timely notify Noroton that
Noroton had not complied with the Future Funding Requirements.
The Loan Agreement imposed no notice obligation on Trez.  To the
contrary, it required Noroton to comply with each of the Future
Funding Requirements by February 13, and allocated to Trez the
power to determine as a matter of its "sole and absolute
discretion" whether Noroton had complied with that obligation.

    The Loan Agreement states that "Borrower waives
presentment, demand, protest and notices of protest, nonpayment,
partial payment and all other notices and formalities, except as
expressly called for in this Agreement."  (Emphases added.)
Likewise, Trez had no obligation to inform Noroton by a certain

time of its decision to withhold further funding.  The Loan

Agreement provides that

> [n]o delay or omission by Lender in exercising any
> right, power or remedy hereunder, and no indulgence
> given to Borrower with respect to any term, condition
> or provision set forth herein, shall impair any right,
> power or remedy of Lender under this Agreement, or be
> construed as a waiver by Lender of, or acquiescence
> in, any Event of Default.  Likewise, no such delay,
> omission or indulgence by Lender shall be construed as
> a variation or waiver of any of the terms, conditions
> or provisions of this Agreement.

(Emphases added).

In any event, Trez gave Noroton notice in advance of the

February 13 FFR Deadline of several outstanding issues,

including the budget imbalance, the funding shortfalls, the

absence of building permits, and the need to submit the

subcontractor will-serve letters.  The CBRE review occurred

expeditiously after Noroton provided some of the missing Project

documents to CBRE, and Noroton does not contend otherwise.[14]  It

---

[14] On December 16, Russ Holland of Trez emailed Noroton's project
manager to tell him to get certain outstanding documents "to Tom
at CBRE ASAP" because "[h]e need[ed] th[em] to complete his
review and we need his review ahead of any additional funding on
the loan."  No one from Noroton provided the documents in
December, so on January 2, Holland again reached out to remind
Noroton of the missing documents.  Despite Trez's reminders, the
CBRE Report indicates that CBRE did not receive the necessary
drawings until January 8, did not receive an executed version of
the Construction Contract until January 22, did not receive
copies of the permit applications until January 28, and never
received an executed version of the GMP Amendment.

was Trez's Scheeres who initiated a conversation with Noroton
about outstanding issues; she did so without any inquiry from
Noroton about its fulfillment of the Future Funding
Requirements.  In short, other than Trez's slowness in approving
the template for the subcontractor letters, Noroton has not
pointed to any delay on the part of Trez in assisting Noroton to
meet Noroton's obligations.

Noroton argues that the only issue that Trez raised before
the February 13 FFR Deadline was the absence of the will-serve
letters from subcontractors, an item listed in a February 10
email inquiry from a Trez attorney.  This argument ignores too
much of the record.  Noroton itself knew that it was having
problems funding the Project, and it admitted as much to Trez in
early February.  On February 4, Scheeres advised Noroton of a
host of outstanding issues that went to the heart of the Project
and Trez's willingness to fund the Project.  She explicitly
advised Noroton that there would be no further funding by Trez
until its concerns were satisfied.  In response, Noroton advised
Trez both that the Project was underfunded and that it was
considering the Alternative Development, which of course would
require the parties to negotiate a new loan agreement or
radically amend the current Loan Agreement.

Moreover, the February 10 email does not purport to be an exhaustive list of outstanding items for the Future Funding Requirements.  The email from the Trez attorney states that Trez was "looking for" three listed items.  Neither that email nor Noroton's response indicates that these are the only outstanding Future Funding Requirements.  The email therefore did not (and of course could not) limit Noroton's obligations under the Loan Agreement and does not show that Trez failed to communicate adequately its concerns about Noroton's compliance with the Loan Agreement's Future Funding Requirements.

Finally, Noroton argues that the Loan Agreement imposed on Trez an implied covenant of good faith and fair dealing and that Trez breached the covenant by improperly withholding funding and by failing to facilitate satisfaction of the Future Funding Requirements.  Noroton has failed to show that Trez breached the implied covenant.  Trez was entitled under the Loan Agreement to withhold further funding on the ground that the Future Funding Requirements had not been satisfied.  Further, as explained above, Noroton has not shown that Trez frustrated Noroton's ability to meet the FFR Deadline with respect to five separate Future Funding Requirements.

Moreover, under New York law, "[e]ven after you have signed a contract, you are not obliged to become an altruist toward the

other party and relax the terms if he gets into trouble in performing his side of the bargain." Gaia House Mezz LLC v. State St. Bank & Tr. Co., 720 F.3d 84, 94 (2d Cir. 2013) (citation omitted).  "[T]he implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990) (citation omitted) (applying New York law).  Additionally, under New York law, the implied covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract.  It does not add to the contract a substantive provision not included by the parties." Broder v. Cablevision Sys. Corp., 418 F.3d 187, 198–99 (2d Cir. 2005) (citation omitted).  Nor may "[a] claim for breach of the implied covenant of good faith and fair dealing . . . substitute for an unsustainable breach of contract claim." Skillgames, LLC v. Brody, 767 N.Y.S.2d 418, 423 (1st Dep't 2003).  Thus, Noroton's attempt to shift responsibility for its own failure to comply with its contractual obligations fails.[15]

---

[15] Noroton argues that Trez violated the implied covenant because it improperly "concealed" that its Credit Committee had recommended an extension of the deadline to satisfy the Future Funding Requirements.  There was nothing improper in Trez's

In sum, Noroton failed to satisfy at least five of the Future Funding Requirements in the Loan Agreement by the February 13, 2020 deadline.  As a result, Trez was not obligated by the Loan Agreement to disburse any additional funds to Noroton.

II.  Remaining Counterclaims

Noroton's remaining counterclaims lack merit.  They are either duplicative of its breach of contract claim or are not supported by the record.  Accordingly, judgment is granted to Trez on each of the counterclaims.

A.   Covenant of Good Faith and Fair Dealing

For the reasons already discussed, Noroton's counterclaim for breach of the covenant of good faith and fair dealing fails. Here, the claim for breach of the implied covenant of good faith and fair dealing is based on the same dispute about whether Trez breached the Loan Agreement by declining to continue funding the loan.

B.   Promissory Estoppel

Noroton's promissory estoppel claim is based on the contention that Trez promised that funding for the Project was

---

actions here.  Trez had no duty to disclose its internal deliberations to Noroton.

49

committed, secure, and available but then "wrongfully refused to fund the construction."  This claim fails.

A cause of action for promissory estoppel under New York law requires the plaintiff to prove "that the defendant made a clear and unambiguous promise, upon which the plaintiff reasonably relied, to its detriment."  NRP Holdings LLC v. City of Buffalo, 916 F.3d 177, 202 (2d Cir. 2019) (citation omitted). "[A] party may not maintain a promissory estoppel claim where the promises on which the claim is based are expressly contradicted by a later written agreement covering the same subject matter."  Sec. Plans, Inc. v. CUNA Mut. Ins. Soc., 769 F.3d 807, 816 (2d Cir. 2014) (citation omitted) (applying New York law).  Moreover, a promissory estoppel claim is duplicative of a breach of contract claim unless the plaintiff alleges that the defendant had a duty independent from any arising out of the contract.  Celle v. Barclays Bank P.L.C., 851 N.Y.S.2d 500, 501 (1st Dep't 2008).

Noroton's promissory estoppel claim is duplicative of its breach of contract claim.  The claim arises from Noroton's assertion that Trez failed to comply with its funding obligations in the Loan Agreement.  As just explained, Trez had no obligation to provide additional funding to Noroton.

Further, to the extent that the promissory estoppel claim is based on statements Trez made to Noroton prior to entering the Loan Agreement, the Loan Agreement bars the claim.  The Loan Agreement provides that:

> [t]his Agreement, the Note, the Mortgage and the other Loan Documents embody the entire agreement of the parties . . . and all prior agreements among or between such parties are superseded by the terms of this Agreement, the Note, the Mortgage and the other Loan Documents.  <u>There are no representations</u>, promises, warranties, understandings or agreements expressed or implied, oral or otherwise, in relation thereto, <u>except those expressly referred to or set forth herein</u>.

(Emphases added.)  Any promises or representations made to Noroton about the Project prior to the execution of the Loan Agreement on November 15, 2019 were therefore superseded by the Loan Agreement.

Noroton argues that Holland misrepresented the security of the loan funds after November 15 during a telephone conference call on November 21.  Cory Attra, Noroton's project manager, and Tom Walsh of AP assert that Trez's Holland said on November 21 that "the funds for the Project had already been segregated and set aside by Trez, and that these funds were entirely secure."  This argument also fails.  The Loan Agreement provides that "[n]o promise, representation, warranty or agreement made subsequent to the execution and delivery of this Agreement by either party hereto . . . shall be valid unless the same shall

be in writing signed by all parties hereto."  There is no
writing executed by the parties that altered the terms of the
Loan Agreement that are at issue here.  Thus, Noroton's
promissory estoppel claim is dismissed because it is duplicative
of the breach of contract claim and is barred by the Loan
Agreement.

Even though Noroton's claim fails for the reasons just
explained, it is worth noting that Trez offered evidence at
trial that it had indeed set aside funds to support the Project.
Noroton's promissory estoppel claim is driven by its contention
that the financial pressure on Trez created by the COVID-19
pandemic gave Trez a strong motive to abandon the Project.  But,
whatever Trez's motives and capacity, both parties were entitled
even during a pandemic to the enforcement of the Loan Agreement
they negotiated and executed.  Noroton failed to comply with the
conditions precedent in the Loan Agreement that would have given
it a right to further funding from Trez.

C.   Negligent Misrepresentation

Noroton claims that Trez negligently represented during
negotiations of the Loan Agreement that the funding for the
Project was secure and available.  Noroton's claim for negligent
misrepresentation fails.

As a preliminary matter, the parties disagree over whether New York or Connecticut law governs Noroton's counterclaim for negligent misrepresentation.  Noroton seeks application of Connecticut law since the Project was for the development of property in Connecticut and Noroton is a resident of Connecticut.

The Loan Agreement contains a choice of law provision and selects New York law as the law that will govern its terms.  It provides that the agreement itself, "the note and the other loan documents and the obligations arising hereunder and thereunder shall be governed by, and construed in accordance with, the laws of the state of New York applicable to contracts made and performed in such state . . . ."

A federal court sitting in New York in a diversity case applies New York law to determine the scope of a choice-of-law clause in a contract.  AEI Life LLC v. Lincoln Benefit Life Co., 892 F.3d 126, 132 (2d Cir. 2018).  "Contractual choice of law provisions are generally enforceable under both New York law and federal common law."  Arnone v. Aetna Life Ins. Co., 860 F.3d 97, 108 (2d Cir. 2017).  "The effect of a choice-of-law clause depends on its scope, and New York courts are reluctant to read choice-of-law clauses broadly."  Id. (citation omitted).

Nonetheless, a contract's choice of law provisions may
encompass tort claims as well as contract claims.  Under New
York law, however, "[i]t is a well-established principle that a
simple breach of contract is not to be considered a tort unless
a legal duty independent of the contract itself has been
violated."  Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70
N.Y.2d 382, 389 (1987); see also Bayerische Landesbank, N.Y.
Branch v. Aladdin Cap. Mgmt. LLC, 692 F.3d 42, 58 (2d Cir.
2012);  Hargrave v. Oki Nursery, Inc., 636 F.2d 897, 899 (2d
Cir. 1980) (applying New York law).  "This legal duty must
spring from circumstances extraneous to, and not constituting
elements of, the contract, although it may be connected with and
dependent upon the contract."  Clark-Fitzpatrick, 70 N.Y.2d at
389.

> If the only interest at stake is that of holding the
> defendant to a promise, the courts have said that the
> plaintiff may not transmogrify the contract claim into
> one for tort.  But if in addition there is an interest
> in protecting the plaintiff from other kinds of harm,
> the plaintiff may recover in tort whether or not he
> has a valid claim for breach of contract.

Hargrave, 636 F.2d at 899 (citation omitted).

The choice-of-law provision in the Loan Agreement applies
to Noroton's claim of negligent misrepresentation.  Noroton
claims that Trez "negligent misrepresented the security and
availability" of the funds for the Project when it failed to

explain that those funds were subject to investor redemption.
At bottom, this is a claim to recover damages due to Trez's
failure to provide further funding for the Project.  Thus, the
claim turns on the "obligations arising under" the Loan
Agreement and falls within the scope of the choice-of-law
provision in the Loan Agreement.

Noroton's claim for negligent misrepresentation fails under
New York law.  Under New York law, for a defendant to be liable
for negligent misrepresentation, the plaintiff must show:

> (1) the defendant had a duty, as a result of a
> special relationship, to give correct information;
> (2) the defendant made a false representation that he
> or she should have known was incorrect; (3) the
> information supplied in the representation was known
> by the defendant to be desired by the plaintiff for a
> serious purpose; (4) the plaintiff intended to rely
> and act upon it; and (5) the plaintiff reasonably
> relied on it to his or her detriment.

Anschutz Corp. v. Merrill Lynch & Co., Inc., 690 F.3d 98, 114
(2d Cir. 2012) (citation omitted).  An "arm's length transaction
between" a borrower and a lender does not give rise to a
"special relationship" for the purposes of a negligent
misrepresentation claim.  N.Y.C. Waterfront Dev. Fund II, LLC v.
Pier A Battery Park Assocs., LLC, 172 N.Y.S.3d 7, 9-10 (1st
Dep't 2022).

Because the parties here were engaged in an arm's length
transaction between a borrower and a lender, there was no

55

"special relationship," which is required for a negligent

misrepresentation claim.  Thus, it is unnecessary to address

whether Noroton has proven the remaining elements of its

negligent misrepresentation claim.

Even assuming Connecticut law applies to Noroton's

negligent misrepresentation claim, the claim still fails.

Connecticut law, unlike New York law, does not require a

"special relationship" between the parties.  Compare Williams

Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 575 (1995)

with Anschutz Corp., 690 F.3d at 114.  Connecticut law requires,

however, that a plaintiff prove

> [b]y a preponderance of the evidence: (1) that the
> defendant made a misrepresentation of fact (2) that
> the defendant knew or should have known was false, and
> (3) that the plaintiff reasonably relied on the
> misrepresentation, and 4) suffered pecuniary harm as a
> result."

Stuart v. Freiberg, 316 Conn. 809, 821-22 (2015) (citation

omitted).

Noroton has not shown that it "reasonably relied" on the

alleged misrepresentation by Trez about its capacity to fund the

loan.  In the Loan Agreement, Noroton expressly waived reliance

on any Trez representations.  Noroton acknowledged

> that the execution and delivery of this Agreement is
> its free and voluntary act and deed, and that said
> execution and delivery have not been induced by, nor
> done in reliance upon, any representations, promises,
> warranties, understandings or agreements made by

> Lender, its agents, officers, employees or
> representatives.

(Emphasis added.)  Thus, as Noroton acknowledged, it did not

rely on any representations in entering the Loan Agreement.

"Without _actual_ reliance, reasonable reliance cannot possibly

exist."  _Stuart_, 316 Conn. at 829.[16]  Finally, Noroton has not

carried its burden to show that any damages it suffered were

caused by the asserted misrepresentation.  Once it failed to

timely satisfy the Future Funding Requirements, Noroton lost any

right to claim additional funding from Trez.

    D.    CUTPA

    Finally, Noroton claims that Trez misrepresented the source

of its funding for the Project in violation of the Connecticut

Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a _et seq._

("CUTPA").  Applying New York's choice of law rules, and for the

reasons already explained, CUTPA does not govern this dispute.

---

[16] The cases that Noroton cites -- _D-Ulisse-Cupo v. Board of Directors of Notre Dame High School_, 202 Conn. 206 (1987), and _Williams Ford, Inc. v. Hartford Courant Co._, 232 Conn. 559 (1995) -- are not to the contrary.  Both cases held that a cause of action for negligent misrepresentation may exist regardless of whether the facts also give rise to a contract claim.  _See D-Ulisse-Cupo_, 202 Conn. at 218 (employment action); _Williams_, 232 Conn. at 579 (purchase of advertising space).  Neither case, however, addressed a situation where a party signed a written agreement in which it disclaimed any "reliance upon[] any representations" made by the counterparty.

In any event, even if CUTPA did apply, Noroton's claim
fails.  CUTPA provides that "[n]o person shall engage in unfair
methods of competition and unfair or deceptive acts or practices
in the conduct of any trade or commerce."  Conn. Gen. Stat.
§ 42-110b(a).

To determine whether a practice constitutes a CUTPA
violation, courts weigh three factors:

> (1) Whether the practice, without necessarily having
> been previously considered unlawful, offends public
> policy as it has been established by statutes, the
> common law, or otherwise -- whether, in other words,
> it is within at least the penumbra of some common law,
> statutory, or other established concept of unfairness;
> (2) whether it is immoral, unethical, oppressive, or
> unscrupulous; (3) whether it causes substantial injury
> to consumers.

Fabri v. United Tech. Int'l, Inc., 387 F.3d 109, 120 (2d Cir.
2004) (citation omitted).  A CUTPA plaintiff "need not establish
all three criteria to demonstrate unfairness.  Instead, a
practice may be shown to be unfair either because of the degree
to which it meets one of the criteria or because to a lesser
extent it meets all three."  Id. (citation omitted).

But, a "simple contract breach is not sufficient to
establish a violation of CUTPA."  Richards v. Direct Energy
Servs., LLC, 915 F.3d 88, 102 (2d Cir. 2019) (citation omitted).
To plead a CUTPA claim, a plaintiff "must show aggravating
circumstances," Fabri, 387 F.3d at 122 n.3 (citation omitted),

or "some conduct that was more offensive than simply" breaching

a contract.  Boulevard Assocs. v. Sovereign Hotels, Inc., 72

F.3d 1029, 1039 (2d Cir. 1995).  Because a plaintiff who

prevails on a breach of contract claim may not recover punitive

damages, see, e.g., Carvel Corp. v. Noonan, 350 F.3d 6, 24 (2d

Cir. 2003), while a plaintiff who prevails on a CUTPA claim may,

Conn. Gen. Stat. § 42-110g(a), courts have refused to allow

breach of contract claims to be converted into CUTPA claims,

concluding that "the Connecticut legislature, in enacting

CUTPA," would not have "intended such an extraordinary

alteration of the common law."  Boulevard, 72 F.3d at 1039.

Noroton's CUTPA counterclaim is essentially a claim that

Trez breached the Loan Agreement by failing to provide funds

after the initial disbursement.  As a simple breach of contract

claim, it is not actionable under CUTPA.

Moreover, even assuming the statute otherwise applied,

Noroton's CUTPA claim would still fail.  Through this claim

Noroton essentially asserts that Trez misrepresented the

security of its funding for the Project.  This does not

constitute an aggravating circumstance that would make Trez's

behavior an "unfair or deceptive practice" actionable under

CUTPA.  The only aggravating factors that Noroton identifies are

that it was allegedly "induced" to enter the Loan Agreement by

the alleged misrepresentation about the security of the Trez
funding and that Trez failed to give Noroton adequate notice
about Noroton's failure to satisfy the Future Funding
Requirements.  As already explained, when it executed the Loan
Agreement Noroton expressly disclaimed any reliance on
representations by Trez.  Further, although the Loan Agreement
did not require it to do so, Trez notified Noroton in advance of
the FFR Deadline of its concerns about Noroton's satisfaction of
the Future Funding Requirements.  In sum, Noroton has not shown
that Trez's actions were immoral, unethical, oppressive, or
unscrupulous or offend public policy as required to prevail on a
claim under CUTPA.

Finally, Noroton has not shown that any conduct by Trez
caused damage to Noroton.  The source and security of the Trez
funding is ultimately immaterial to this dispute.  Trez had no
obligation to provide funds to Noroton after the initial
disbursement unless Noroton timely satisfied the Future Funding
Requirements.  Thus, any injury felt by Noroton was proximately
caused not by representations made by Trez, but by Noroton's own
failure to satisfy the conditions precedent to the receipt of
further funding under the Loan Agreement.

## Conclusion

Judgment is entered for Trez on all claims and counterclaims in the case. Noroton did not satisfy subsections (b), (c), (d), (e), or (k) of the Future Funding Requirements within ninety days of the closing date, as required under the Loan Agreement to receive further funding. Trez is not liable for any damages purportedly sustained by Noroton due to the failure to provide further funding.


Dated:     New York, New York
           November 8, 2022

                                    _____
                                          DENISE COTE
                                    United States District Judge